**Helen McDONNELL, Plaintiff,**

v.

**S & S PRODUCE COMPANY, INC., and Thomason Stewart, Defendants.**

**Civ. A. No. 87–200–JLL.**

United States District Court, D. Delaware.

July 11, 1988.

Eugene J. Maurer, Jr., Wilmington, Del., and Thomas J. Ericson of Ericson & Uberti, West Chester, Pa., for plaintiff.

Louis Bell and Kevin J. Connors of Liebert, Short, Fitzpatrick & Hirshland, Philadelphia, Pa., for defendants.

## OPINION

LATCHUM, Senior District Judge.

Plaintiff, Helen McDonnell, brought this civil derivative action against defendants, S & S Produce Company, Inc., and its employee, Thomason Stewart, seeking compensatory damages for personal injuries plaintiff sustained as a result of a motor vehicle accident which occurred at about 8:00 a.m. on April 17, 1985, at the intersection of U.S. Route 13 and Memorial Drive in New Castle County, Delaware (Docket Item ["D.I."] 33, ¶ 3). At the conclusion of the three-day trial, the jury deliberated and returned a verdict for the plaintiff, finding the defendants 98% negligent, the plaintiff 2% negligent, and the plaintiff's total compensatory damages to be $225,000 (D.I. 47). The Court, in accordance with Delaware Comparative Negligence Statute (10 Del.C.§ 8132), reduced the total damages award by 2% and entered judgment for the plaintiff in the amount of $220,500.00 (D.I. 46).

Presently before the Court is defendants' timely filed posttrial motion pursuant to Fed.R.Civ.P. Rule 59. First, defendants contend that the Court erred in instructing the jury on the plaintiff's duty of care when entering an intersection on a green signal light, and that this calls for a new trial. Second, defendants contend that the verdict holding the plaintiff only 2% negligent is contrary to the law and evidence and hence a new trial is required. Finally, defendants maintain that the jury's award of $225,000 as compensatory damages is excessive under the facts of this case and alternatively: (1) a new trial is required, or (2) a new trial on the issue of damages is required, or (3) a new trial on the issue of damages is required conditioned upon the failure of the plaintiff to remit a portion of the jury's award (D.I. 52). The Court will consider these contentions *seriatim* and discuss the facts as appropriate to each point.

## I. JURY INSTRUCTION ERROR

As previously noted, defendants request a new trial based on the contention that the Court erred in its instructions as to plaintiff's duty of care upon entering an intersection on a green traffic signal. The record and the applicable law indicate there is no merit to this contention.

At the Court's direction, on January 7, 1988, the parties submitted proposed jury instructions. Defendants' proposed jury instruction 20 read:

"20. The presence of signals at a crossing does not relieve a driver of the duty to keep a proper lookout, nor does the existence of a favorable traffic signal release a driver from the obligation to keep a proper lookout."

(D.I. 35, Pt. 20.)

On March 24, 1988, the Court, after considering the proposed charges of both sides, forwarded the Court's proposed charge to the jury and invited comments by counsel. In the Court's charge, it did not include defendants' Point 20.

By letter to the Court, dated March 16, 1988 (A–378)[1], defendants' counsel again requested the Court to include Point 20 in the Court's charge. On April 12, 1988, the Court sent its amendment to its proposed charge on this issue to counsel. This amended portion of the jury charge was given to the jury as follows:

> Delaware law recognizes that the existence of a favorable or green traffic signal does not release a motorist from the obligations imposed by law, such as the duty to keep a proper lookout.
>
> Thus, when a driver enters an intersection, that driver has an obligation to avoid an accident if it becomes obvious to him that another driver will ignore a red light signalling him to stop.
>
> Moreover, in the absence of circumstances which would put a reasonable person on notice of impending danger, the driver with a green light has a right to assume that he can cross the intersection safely and that cross traffic will stop in obedience to the red light against it.

(A–290.)

■ Before the charge was read to the jury, counsel for neither side took any exceptions to the amended charge of the Court which included the language quoted above (A–244). Because defendant did not object to the revised jury instruction, the objection is waived. Rule 51, Fed.R.Civ.P. But even more important, the charge given to the jury on this issue was a correct synopsis of Delaware law on the duty of care owed by one entering an intersection with a green signal light. *See, e.g., Carnes v. Winslow,* 182 A.2d 19, 21 (Del.Supr. 1962); *Warrick v. Brode,* 428 F.2d 699, 701 (3d Cir.1970), and *Nolan v. Sullivan,* 372 F.2d 776, 780 (3d Cir.1967) (last two cases interpreting Delaware law).

Thus the Court will deny defendant a new trial based on an erroneous jury charge as to the plaintiff's duty of care.

## II. APPORTIONMENT OF RELATIVE FAULT

■ Defendants' second contention is that the jury's apportionment of only 2% negligence to the plaintiff was unreasonable and contrary to the law and evidence. Reviewing the evidence in the light most favorable to the plaintiff, the collision occurred when Stewart's tractor trailer, proceeding in the northbound lanes of U.S. Route 13, passed through a red signal light and struck the left side of plaintiff's automobile. Plaintiff was proceeding west on Memorial Drive on a green signal light. Plaintiff testified that when the signal light turned green, she proceeded into the intersection and was intent on determining whether the vehicles proceeding easterly on Memorial Drive were going to proceed straight or turn north on Route 13 (A–56), and she did not see the tractor trailer bearing down upon her until she was in the first northbound lane of Route 13. She looked up to see the truck when she heard the blast of the truck's horn (A–58; A–104). Based on this testimony the jury allocated 2% negligence to the plaintiff. Defendants, based on this testimony, contend that the jury's allocation of such a small amount of negligence was wholly unreasonable and a product of prejudice against an out-of-state trucker and sympathy for the plaintiff. The Court is unable to agree with this contention in view of other testimony at trial. Mr. Eugene Onesi, an eye witness to the collision who was driving his automobile in the same direction as defendants' truck, testified that as the truck started on

---

1. The Appendix which includes the trial testimony, arguments of counsel and jury charge is found in D.I. 55A and will be referred to herein by pages "A–1" etc.; "PX" refers to plaintiff's exhibits.

the downgrade toward Memorial Drive, the signal light changed from green to yellow (A–34). He slowed down but it appeared that the truck accelerated towards the intersection, proceeding at better than 50 miles per hour (A–34; A–37). Mr. Stewart, the truck driver, testified he had no idea of the color of the signal light as he approched the intersection (A–211; A–217). Stewart also testified he was unable to stop the truck, loaded with 40,000 pounds of chicken, before hitting plaintiff's car after he saw her in the intersection (A–212 to 216). The Court's charge to the jury explained the principle of compartive negligence and the jury considering all the testimony and its credibility, allocated 98% negligence to the defendants and 2% negligence to the plaintiff. The Court cannot conclude that the apportionment of negligence between the parties was unreasonable or contrary to the law or evidence and a new trial is not justified on this ground.

### III. EXCESSIVE COMPENSATORY DAMAGES

Defendants' final contention is that the compensatory damages awarded were so excessive that a new trial on the issue of damages should be granted or that they are entitled to a remittitur.

■ The question of excessiveness of a jury verdict is a matter addressed to the sound discretion of the trial court. *Edynak v. Atlantic Shipping, Inc., CIE Chambon,* 562 F.2d 215, 225–26 (3d Cir. 1977), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978). Thus, if the trial court perceives the damages assessed to be "shocking to the judicial conscience" or "so unreasonable as to offend the conscience of the court," the trial judge may vacate the jury's award and grant a new trial. *Schreffler v. Board of Education of Delmar School District,* 506 F.Supp. 1300, 1308 (D.Del.1981), (*citing Murray v. Fairbanks Morse,* 610 F.2d 149, 152 (3d Cir. 1979); *Tann v. Service Distributors, Inc.,* 56 F.R.D. 593, 598 (E.D.Pa.1972), *aff'd without opinion,* 481 F.2d 1399 (3d Cir.1973)).

■ "When the problem or error in the first proceeding involves the size of the verdict a court may order a conditional new trial.... Thus, the court may state that it will grant a new trial unless the opposing party agrees to accept a specified reduction ... in the verdict." *Brown v. McBro Planning and Development Co.,* 660 F.Supp. 1333, 1337 (D.V.I.1987). Thus, the Court can grant a remittitur and propose a reduction of the jury award when in its discretion it decides that a verdict is so grossly excessive that it is not rationally related to the evidence adduced at trial. *See Walters v. Mentec/International,* 758 F.2d 73, 82 (3d Cir.1985); *Kazan v. Wolinski,* 721 F.2d 911, 913 (3d Cir.1983).

■ For the reasons stated below, the Court holds that the jury verdict of $225,000 as plaintiff's compensable damages reduced by 2% shocks the conscience of the Court as it exceeds the amount reasonably ascertainable from the evidence.

The plaintiff is a 38–year old intelligent single woman (PX 20; A–45). She has suffered cerebral palsy since earliest childhood (A–49; A–52). During the trial, the Court and jury became well aware of the plaintiff's symptoms from this pre-existing disability. The disability was manifested by her uncoordinated gate, the spastic movements of her arms and hands, her eye coordination problem, her small hearing loss in one ear, and her slight speech impediment (A–52; A–107). The nature of her obvious preexisting disabilities undoubtedly tended to provoke sympathy which, contrary to the Court's instructions (A–298), could have caused the jury to undertake the task of compensating the plaintiff for her disabilities and suffering not attributable to the accident. No one questions that plaintiff was injured in the accident. Although the plaintiff missed a few days from work, she returned to her job eight days after the accident on April 25, 1985 (A–71; A–90). Once she returned to work, she missed only a few more days thereafter as a result of the accident (A–72; A–74). Following the accident, plaintiff, in 1986, was promoted from a psychiatric social worker to Director of Community Sup-

port and Psychosocial Rehabilitation (A–89 to 90). She received an increase in salary and became responsible for supervising twenty-one employees (A–44; A–89 to 90).

Plaintiff's soft tissue injuries (strains and contusions) completely resolved themselves by August, 1985 (A–86; A–94 to 95). Dr. Michael Peters, plaintiff's physician, considered all these injuries resolved on June 18, 1985 (A–353 to 354). Plaintiff suffered no broken bones or lacerations (A–92 to 93) and, in fact, plaintiff felt well enough to go on a two-week vacation in August, 1985 and to cancel her physical therapy as a consequence (A–136; A–355 to 356).

Plaintiff testified that she suffered occasional depression and nightmares after the accident (A–80). However, she was not hospitalized or bedridden by any psychological trauma caused by the accident (A–136). Plaintiff's expert, Dr. Fraunces, a psychologist for the Philadelphia Police Department, simply expected that the plaintiff would contact a psychologist perhaps two to four times a year in the future (A–133). Yet, plaintiff was not so traumatized by the accident that she was not able to resume driving her automobile almost immediately after the accident (A–54). Plaintiff's physician, Dr. Peters, noted on June 18, 1985, that she was "less anxious. Has new car and is driving." (A–352). In fact, plaintiff testified that her trauma did not prevent her from making a 50–minute drive each way every time that she paid a visit to her psychologist (A–54; A–135). In addition, the evidence was undisputed that plaintiff had been treated for depression prior to the accident (PX 21, File 1 of 2).

There was some mention in the testimony that plaintiff suffered from carpal tunnel syndrome (A–106) but Dr. Peters, plaintiff's physician, testified that this condition was not caused by the accident (A–370) but was a result of the way she held her hands while she slept (A–365 to 367).

Plaintiff also testified that she suffered a herniated meniscus in her left shoulder from the accident which caused her to limit, to a degree, what she could do with her left arm (A–83 to 85). There was no surgical correction for this problem, nor is any planned in the future (A–84; A–364; A–369). Dr. Peters also testified that plaintiff's prognosis for all her injuries, including her left shoulder, is good (A–342). Even after the accident, on May 9, 1985, Dr. Peters reported that plaintiff had a good range of motion in her left shoulder (A–350 to 351), and an X-ray study of the shoulder in August, 1985, revealed no abnormalities (A–356 to 357). On the other hand, there was trial evidence which indicated plaintiff had a preexisting problem with her left shoulder long before the accident on April 17, 1985 (A–98 to 100; A–359 to 361; PX 21, 1 of 2 files). Plaintiff had complained of problems with her left shoulder to Dr. Peters in 1980 (A–344), in 1982 (A–359), and a little over one month before the accident (A–360). Dr. Peters further testified that plaintiff would have some limit in her shoulders as a consequence of her cerebral palsy (A–362). The relationship between plaintiff's cerebral palsy and problems with her left shoulder is borne out by the fact that she has similar problems with her right shoulder which was uninjured in the 1985 accident (PX 23).

Plaintiff also testified that her social activities had been somewhat restricted since the accident because she tires easily (A–87). Yet, the plaintiff continues to work full time and to participate in the same social activities that she did before the accident (A–91). There was ample evidence that many of plaintiff's physical limitations are attributable to causes other than the accident of April 17, 1985 (*e.g.*, A–344; A–359 to 362; A–364 to 367; A–370).

The jury was charged that plaintiff's accident occurred after the adoption of Delaware's comprehensive motor vehicle insurance program, generally referred to as "No Fault" insurance and that since plaintiff had this coverage, she had been compensated for her past expenses arising from the accident, including medical and hospital expenses, expenses for medicines, X-rays, and incidental expenses and for past lost wages (A–295 to 296). The jury was charged that as a result plaintiff could not recover any of those expenses because they did not

exceed her available "No Fault" insurance coverage (A–296), viz. $5,000 for loss of wages and $10,000 for medical or travel expenses (A–115). Moreover, plaintiff did not seek before the jury future medical expenses, future loss of wages (A–113), or the cost of replacement services (A–112).

Thus, the only damages sought by plaintiff before the jury were for past and future pain and suffering, mental and emotional distress and past and future inconveniences that she suffered from the accident (A–296). Nevertheless, the jury returned a verdict of $225,000, finding the defendants 98% negligent and the plaintiff 2% negligent. Based on that verdict, the Court entered judgment for $220,500 (D.I. 46) by reducing the damages verdict by 2%.

Viewing the evidence as to damages in the light most favorable to the plaintiff, the Court is convinced that the award of $225,000 in damages by the jury was grossly excessive, was not rationally related to the evidence adduced at trial, and is of an amount which shocks the conscience of the Court. Thus, in the Court's opinion, the jury could not have awarded an amount in excess of $67,500.00, which, when reduced by 2% for plaintiff's negligence, would result in a judgment for plaintiff of $66,150.00.

Accordingly, an order will be entered granting the defendants' motion for a new trial on the issue of damages[2] unless the plaintiff consents to remit the portion of the jury award in excess of the maximum amount supportable by the evidence and agrees to accept a judgment in the amount of $66,150.00 by a date to be set by the Court.

---

**2.** Under federal law, a limited or partial new trial may be granted when it "clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." *Gasoline Products Co. v. Champlin Refining Co.,* 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931). The Court here finds that the excessiveness of the plaintiff's jury verdict did not in any manner implicate the jury's liability finding which the Court has upheld. *See Walters v. Mintec/International,* 758 F.2d 73, 82 (3d Cir.1985).